IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ABIGAIL ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-484-TCK-PJC |
| | ) | |
| UNIVERSITY OF TULSA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER[1]

Before the Court is Defendant's Motion for Summary Judgment on all remaining claims (Doc. 95). For reasons explained below, the motion is granted.

## I.    Claims for Relief

While a sophomore at the University of Tulsa ("TU"), Plaintiff Abigail Ross ("Ross") reported to the Tulsa Police Department ("TPD") and the TU Dean of Students, Yolanda Taylor ("Taylor"), that TU student Patrick Swilling, Jr. ("Swilling") raped her on the night of January 27, 2014. Swilling was a member of the TU men's basketball team. TU Campus Police ("TUCP")[2] conducted an investigation, and Taylor held a student conduct hearing. Taylor found insufficient evidence that Swilling had violated TU policies prohibiting sexual assault. Subsequently, the Tulsa County District Attorney's office elected not to file criminal charges against Swilling. Ross left TU mid-semester in 2014. TU permitted Swilling to remain on campus and re-enroll the next year.

---

[1] This Opinion and Order was originally filed under seal on April 7, 2016. The Court permitted the parties to request redaction of any sensitive information prior to publication. Upon Ross's request, the Court replaced two names with the pseudonyms Jane Doe 1 and Jane Doe 2. The Court also omitted the names of three other students involved in the 2012 Report.

[2] TUCP is commonly referred to in the record as "Campo."

Ross filed this civil suit seeking damages from TU under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a) ("Title IX") and Oklahoma common law.  Ross asserted six claims for relief: (1) violation of Title IX based on TU's deliberate indifference to prior accusations against Swilling; (2) violation of Title IX based on TU's deliberate indifference to Ross's own complaint against Swilling; (3) negligence per se based on violation of Title IX regulations; (4) negligent failure to protect Ross from sexual assault by Swilling; (5) negligent supervision of Swilling; and (6) intentional infliction of emotional distress ("IIED").  On July 2, 2015, the Court dismissed Ross's negligence per se claim.  TU moved for summary judgment on all remaining claims.

## II.     Relevant Policies

### A.     Dear Colleague Letter

On April 4, 2011, the United States Department of Education Office of Civil Rights ("OCR") issued a nineteen-page letter known as the "Dear Colleague Letter" ("DCL").  This letter explains that "[s]exual harassment of students, including sexual violence, is a form of sex discrimination prohibited by Title IX."  (DCL, Ex. 9 to Pl.'s Resp. to Mot. for Summ. J., at 1.)  The DCL was prompted by "deeply troubling" statistics of sexual violence on college campuses and was aimed at "ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities."  (*Id.* at 2.)

The DCL supplements the OCR's Revised Sexual Harassment Guidance published in 2001 and provides "additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence."  (*Id.*)  With respect to a college's investigation, the DCL explains that "[r]egardless of whether a harassed student, his or her parent, or a third party files a complaint

2

under the school's grievance procedures . . . a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred . . . ." (*Id.* at 4.)  With respect to a college's hearing process, the DCL encourages a preponderance of the evidence standard and discourages allowing students to personally question each other.  The DCL is silent as to a crucial issue in this case -- whether the decisionmaker should consider prior allegations of sexual violence against the alleged perpetrator that do not result in a conviction or other finding of responsibility.  However, the DCL does provide that "prior complaints" against an accused student should be considered in deciding whether and how to proceed when a subsequent victim of that student requests anonymity.  (*Id.* at 5.)

### B.      TU Policies

TU's general policy governing procedures for all student conduct hearings ("General Procedures") provides:

> 3. *Information regarding a prior complaint against the accused student that did not result in a finding of responsibility shall not be admissible at the proceedings.*
> 4.  A finding of no responsibility or partially/fully responsible shall be based on the information presented at the proceeding.
> 5.  The University of Tulsa may designate legal counsel to advise the panel or the Dean as to their conduct of the proceedings against the accused student.
> . . .
> 8.  Formal rules of process, procedures, and/or technical rules of evidence, such as are applied in criminal or civil court are not used in this Code's proceedings.

(Ex. 8 to Pl.'s Resp. to Mot. for Summ. J.)  The General Procedures can be trumped where specific policies allegedly violated "carry their own procedures."  (*Id.* at Art. II.D. (emphasis added).)

TU has a specific policy governing sexual violence ("Sexual Violence Policy"), which was revised after issuance of the DCL.  It provides:

> Because the University stands against [sexual violence] and intends to be in compliance with Title IX, the University will take prompt, decisive action to:

investigate allegations of sexual violence; initiate the disciplinary process if appropriate, and issue appropriate sanctions against any student found responsible for acts of sexual violence whether the behavior occurred on campus or off campus.

(Ex. 21 to Def.'s Mot. for Summ. J.)  The policy provides instructions for reporting sexual violence, stating that "[s]tudents who are the recipients of sexual violence are encouraged to report the incident to appropriate University officials such as Housing staff members, *Campus Security*, a faculty member, and Health Center and Counseling Center staff and to do so immediately." (*Id.* (emphasis added).)

It also sets forth "Courses of Action," which include follow-up medical assistance, counseling, filing a university complaint, and assistance in filing criminal charges.  The section entitled "Filing a University Complaint" largely tracks the DCL and provides:

> C.      Filing a University Complaint: Sexual violence constitutes a violation of University policy.  The University will inform and obtain consent from the complainant before beginning an investigation.  By filing a complaint with the Dean/Associate Dean of Students, complainants will have their complaints investigated by the Dean of Students.  If the Dean finds there is good reason to proceed, the complaint will have access to the provisions of the University Student Code of Conduct.  Most investigations would be expected to be completed within 60 days from the date of the original complaint.
>
> *If the complainant requests confidentiality or asks that the complaint not be pursued, the University will take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or the request not to pursue an investigation.*  If the complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the complainant would be informed that the University's ability to respond may be limited.  The complainant will also be reminded that Title IX prohibits retaliation and that University officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.
>
> After all such advice if the complainant continues to ask that his or her name or other identifiable information not be revealed, the University will evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students.  This includes considering such factors as: the seriousness of the alleged harassment; the complainant's age; *whether there have been other harassment complaints against the same individual*; and the alleged

harasser's rights to receive information about the allegations if the information is maintained as an "educational record" under FERPA.

. . .

If the alleged perpetrator is a TU student, the complainant may choose to have the complaint heard by the University Student Conduct Board or by the Dean/Associate Dean of Students.  Mediation is not an option to resolve a complaint of sexual violence.  Among the provisions of either process are the following:

1. Both parties will be able to present witnesses and evidence;
2. Attorneys will not be permitted for either party;
3. Neither party will be allowed to question or cross examine the other;
4. Both parties will have the opportunity to appeal;
5. *The past sexual history of the complainant and alleged perpetrator will be deemed irrelevant to the proceeding process except as that history may be related directly to the incident being heard*;[3] and
6. A decision will be based on the standard that it is more likely than not that the alleged behavior occurred, sometimes referred to as the preponderance of the evidence.

(*Id.* (emphases added).)

## III.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.*  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

---

[3]  The Court did not locate this language in the DCL.

IV.     **Summary Judgment Record[4]**

The following facts are undisputed or resolved in favor of Ross for purposes of summary judgment.

A.     **CSI Report - January 2012**

Swilling was a student and basketball player at the College of Southern Idaho ("CSI") prior to his enrollment at TU.   On January 6, 2012, a mother of a CSI student emailed Steve Gosar ("Gosar"), head coach of the CSI basketball team, to report that Swilling raped her daughter.  She described Swilling as a "friend that was a guest" in her daughter's apartment when he allegedly raped her.  Gosar reported the incident to the Twin Falls Police Department ("CSI Report"), and the case was assigned to Officer Mynde Heil ("Heil").   Based on the student's description of events, Heil concluded that a crime occurred.  Heil told the student that a detective would contact her.  On January 16, 2012, after being contacted by Detective Jon Wilson ("Wilson"), the student provided a written statement.  On January 17, 2012, the student described events to Wilson consistent with her statements to Heil and her written statement.  The next day, after being contacted again by Wilson, she stated she did not want Wilson to talk to Swilling, that "she just wants to forget this," and that she was a "willing participant in the activity."  Wilson closed the case and concluded that "no crime occurred."  (*See* Ex. 3 to Pl.'s Resp. to Mot. for Summ. J.)

---

[4]  In Ross's response to TU's motion for summary judgment, Ross's counsel submitted an affidavit stating that he was awaiting production of certain compelled emails that were being reviewed for privilege.  (Ex. 7 to Doc. 112.)  To the Court's knowledge, Ross did not supplement the summary judgment record with such emails.

### B.   Recruitment by TU - Spring 2012

During the spring of 2012, TU Director of Basketball Operations Justin Bauman ("Bauman")

called a member of the CSI basketball staff to inquire about Swilling's availability, academics, and

character.  Bauman testified:

> I asked [] what [Swilling] was like off the floor and, especially you know with
> attending class and those things, and he indicated to me that he was a good teammate
> . . . that he was the type of guy, when they all went to supper or something, he would
> pay for everyone's meal; that academically and stuff that there were times he could
> be lazy in terms of showing up on time; and that -- but he was definitely capable and
> very smart.

(Bauman Dep., Ex. 10 to Def.'s Mot. for Summ. J., at 21:16-25.)  Bauman was not told about the

rape allegation but believes his question should have elicited that information.

During the recruiting process, TU basketball head coach Danny Manning ("Manning") spoke

directly with Gosar about Swilling.  Manning asked Gosar if there was anything else he needed to

know about Swilling, which is Manning's customary way of asking if a player has any "off-the-

court" issues.  Gosar did not mention the allegation of rape made against Swilling only a few months

earlier.  Manning testified that he would have expected Gosar to tell him about the rape allegation

either based on his question or at some other point during the recruiting process.  Manning offered

Swilling a position on the basketball team, and Swilling accepted.  On June 12, 2012, TU sent

Swilling an acceptance letter for the 2012-2013 academic year.

### C.   2012 Report - June 23, 2012

Swilling arrived on campus almost immediately after his acceptance in June 2012.  Other

student athletes, including female soccer players, were also on campus.  One such soccer player,

referred to as Jane Doe 1, and Swilling attended the same party on the evening of June 22, 2012.

On the morning of June 23, 2012, two TU football players called TUCP and reported that Swilling

raped Jane Doe 1in her on-campus apartment.  They reported that another student, who was the friend of Jane Doe 1 and girlfriend of one of the reporting football players, was a possible witness to the rape.  TUCP officer Bryan Underwood ("Underwood") and another officer began to investigate the incident.  The officers attempted to locate and interview Jane Doe 1.  Jane Doe 1 went to the TUCP office around 4:00 p.m.

The parties dispute what happened while Jane Doe 1 was at the TUCP office. Jane Doe 1 contends she told officers that Swilling "took advantage of her" but that she did not want to pursue charges with TPD or file a university complaint.  Underwood contends Jane Doe 1 denied being raped and stated that she had consensual sex with Swilling.[5]

Underwood communicated the information he received up the chain of command, which ended with TUCP Patrol Captain Paul Downe ("Downe").  Downe instructed Underwood not to complete any report.  Within a few days, Downe told TUCP Director, Joe Timmons ("Timmons"), about the report.  Timmons told Downe he probably should have created an "information report" but instructed Downe not to go back and create one.[6]

The parties also dispute whether Jane Doe 1 provided a written statement to TUCP.  Jane Doe 1 told TPD in 2014 that she remembered making a written statement while in the TUCP office.  TU could not locate or produce any written statement when requested to do so in this litigation, and

---

[5]  These facts, which are discussed in more detail in Part V.A, are derived from recorded phone interviews of Jane Doe 1 and Underwood conducted in 2014.  (Exs. 12-14 to Pl.'s Mot. for Summ. J.)   Neither party has objected to consideration of these recordings.

[6]  Ross submitted deposition testimony of Downe on February 15, 2016 as supplemental summary judgment evidence.  (*See* Doc. 207).  The Court accepts and has considered this supplemental evidence.

Underwood denies that she completed a written statement.  The only contemporaneously written record of the 2012 Report is a "Public Safety Dispatchers Daily Activity Report," which states:

> 12) Incident/Call Notes Chronology
>
> 1P2 & T50; Ofc. Underwood took a call from [football player]; . . . that called to report a possible rape between Pat Swilling . . . & [Jane Doe 1].  [Jane Doe 1's friend] . . . is the possible witness.  [Football player] . . . stated [Jane Doe 1's friend] saw the act occur.  Per A2 no report was to be filed.

(Ex. 15 to Def.'s Mot. for Summ. J.)   Ross presented evidence establishing that "A2" refers to Downe.  It is undisputed that TUCP never informed Taylor or any other TU administrator about the 2012 Report.  Taylor first learned of the 2012 Report during the investigation of Ross's report.

**D.   2013 Incident - Spring 2013**

In the spring of 2013, a TU student, referred to as Jane Doe 2, returned to her apartment after a night out.[7]  Several people were there hanging out.  After talking to them for a while, she decided to go to bed.  She went into her bedroom, and Swilling walked in behind her.  He shut the bedroom door and shoved a towel from the hamper under the door.  He then grabbed her skirt, and she screamed.  Her roommate and one of Swilling's teammates responded to her screams and opened the door.  Swilling then left.  No one reported this incident ("2013 Incident") to TUCP or TPD at the time, but it came up during the investigation of Ross's report.  In 2014, Jane Doe 2 still did not wish to make any formal statement or file a complaint against Swilling because, in her words, nothing happened.

---

[7]  Facts regarding the 2013 Incident are derived from a recorded statement taken by TPD of Jane Doe 2 on February 18, 2014, (Ex. 19 to Def.'s Mot. for Summ. J.), and a TUCP witness statement she completed on March 8, 2014, (*see* Ex. 24 to Def.'s Mot. for Summ. J.; Ex. 28 to Pl.'s Mot. for Summ. J (summary of witness statement)).

### E.   Ross's Alleged Rape -  January 27, 2014

According to Ross's testimony, she and Swilling had been texting for a few weeks but did not know each other well.  They decided to hang out one night after exchanging texts.  She drove to his apartment, and they watched TV for a while.  He then threw her back on the bed, tossed her phone out of reach, held her down, and engaged in non-consensual sex with her despite her crying and saying no.  Swilling wore a condom.  Swilling made her "pinky promise" not to tell anyone what happened.  After this, she drove to QuikTrip and then drove to the apartment of Rashad Ray ("Ray").  Ray was another member of the men's basketball team with whom Ross had an on-again, off-again romantic relationship described by Ross as "complicated."  She helped Ray with a paper and then went home.  At some point that night, she texted her friend and roommate Aubrey Wong ("Wong") and said "something bad" had happened with Swilling.

The next day during Ross's morning class, it "hit her" that she had been raped and she began crying.  She texted Wong, who met her back at their sorority house.  Ross told Wong that Swilling raped her, and Wong recommended that they report it to TPD.  Wong testified that Ross was reluctant to make the report and was concerned about her name being kept confidential.  Ross and Wong went to TPD together and spoke with Detective Eric Leverington ("Leverington"), who advised Ross to have a rape kit performed at the hospital.  Ross decided not to file a report with TPD or initiate student conduct proceedings at that time, but she did go to the hospital with Wong and have the rape kit performed.[8]

---

[8]  There is disputed record evidence regarding what occurred between January 28, 2014 and February 11, 2014, such as what Ross and Swilling texted to each other.  These facts are not material to the Court's resolution of the case and do not preclude summary judgment.

### F.   Ross's Reports - February 11, 2014

On or around February 9, 2014, Ross told her mother and TU alumna, Kami Ross, that Swilling raped her. On February 11, 2014, her mother traveled to Tulsa and assisted Ross in filing formal complaints with Leverington at TPD and Taylor at TU.  TPD began an investigation led by Leverington.  Taylor contacted Timmons, who assigned two TUCP officers to the case.  Taylor set a hearing before the student conduct board for March 5, 2014.  Swilling was immediately suspended from the men's basketball team.  Upon Swilling's suspension, TU hired outside counsel, Pat Cremin ("Cremin"), who consulted with Taylor throughout the investigation and proceedings.  Both Ross and Swilling retained attorneys who became highly involved in the TU proceedings, and both Cremin and Taylor communicated with the students' counsel.

### G.   Postponement of Hearing - March 5, 2014

In preparation for the March hearing, TUCP only interviewed Ross and Swilling.  Despite both students' identification of numerous witnesses, TUCP did not obtain statements from them. One day prior to the March hearing, Ross's counsel sent Taylor a letter stating that (1) after reviewing the TUCP investigation report, he did not believe the matter had been sufficiently investigated, and (2) Ross had the right under the Sexual Violence Policy to proceed before Taylor rather than the student conduct board.  Taylor agreed that the matter had not been sufficiently investigated, that TU was not prepared for a hearing, and that Ross had the right to proceed before her as the sole decisionmaker.  Taylor told Timmons that TUCP had not done its job and asked him why TUCP's report was so incomplete.  Via emails to Swilling and Ross, Taylor postponed the hearing.

After receiving Taylor's email, Ross, her mom, and her aunt (who were in town for the hearing) met with Taylor in her office.  Fifteen minutes later, Swilling arrived outside Taylor's office.  Assistant Dean of Students Larry Putnam ("Putnam"), who was in Taylor's office when Swilling arrived, exited the office to intercept Swilling.  When Taylor spoke with Swilling, he was upset that the hearing was cancelled because he was eager to have his name cleared and rejoin the basketball team.  The next day, Swilling's counsel, Corbin Brewster ("Brewster"), left a phone message for Bauman as follows:

> Hey Justin, this is Corbin Brewster.  It's about 8:00 Friday and I wanted to touch base with you.  We had some things happen yesterday that I think are relevant to the basketball program.  Patrick's hearing got postponed by the Student Conduct Board. *And the Assistant Dean told us that he is cleared as far as the University is concerned.*  It's a decision of the basketball program whether he can participate in the tournament.  The hearing has yet to be rescheduled and I don't see it going anywhere at this point. There is some stuff that happened that just may further damage [inaudible] credibility that happened yesterday.  Anyway I wanted to chat with you about that.  When you get a chance call me at . . . .  Thanks.

(Ex. 17 to Pl.'s Mot. for Summ. J. (voice recording transcribed by the Court (emphasis added)).)[9]

Taylor rescheduled the hearing for March 25, 2014.  TUCP began conducting a second investigation, which involved obtaining statements from more than fifteen witnesses and contacting Jane Doe 1 and her friend to discuss the 2012 Report.

### H.   Jane Doe 1 Interviews - March 2014

On or around March 11, 2014, as part of its investigation, TUCP Sergeant Zach Livingston ("Livingston") called Jane Doe 1, recorded a brief phone conversation with her, and memorialized it in a written report that was provided to Taylor before the hearing.  As explained above, Jane Doe

---

[9]  No party objected to consideration of this recording for purposes of summary judgment.

1 denied Underwood's version of events and denied reporting a consensual encounter.  Despite this, Timmons told Taylor before Ross's hearing that the 2012 incident with Jane Doe 1 was a "yes, no, maybe" encounter.  Taylor does not remember reviewing Livingston's written report regarding Jane Doe 1's March 11, 2014 interview.  Taylor listened to Jane Doe 1's interview with Livingston during her deposition and admitted that it was "not at all" what Timmons told her before Ross's hearing.

An investigator from the Assistant District Attorney's Office, Jeff Felton ("Felton"), also contacted Jane Doe 1 while investigating Ross's allegations against Swilling, and this interview lasted over an hour.  It is not clear when this conversation occurred.  Although TU requested information from TPD during its investigation, TPD refused to provide any information.  Thus, neither Taylor nor TUCP may have been privy to Felton's more lengthy interview of Jane Doe 1.  It is undisputed, however, that Taylor had actual knowledge, either through Timmons or the TUCP report, of the CSI Report, the 2013 Incident, and the 2012 Report at the time of the student conduct hearing.

### I.   Student Conduct Hearing - March 25, 2014

On March 25, 2014, Taylor conducted the hearing on Ross's student conduct complaint against Swilling, and the Court has reviewed the transcript.  It appears Ross and Swilling were in separate rooms but could hear each other via speaker phone, and Taylor walked between the two rooms. Each student gave an opening statement, and then Taylor asked questions.  Each student was permitted to ask questions regarding inconsistencies in the other's stories, but Taylor rephrased and asked the questions (presumably to avoid the students directly questioning each other).  Swilling did not call any witnesses.  Ross called one witness, Erin Anderson ("Anderson").

Ross also wanted to call Wong as a hearing witness, but Taylor did not require Wong to attend the hearing.  Prior to the hearing, Wong sent Taylor an email:

> Abby told me that I am required to go however, I do not think my testimony will be helpful to Abby nor do I want to be involved any longer.  Please do not take this to mean that I do not believe her, school is just the most important thing to me.  If I am not required to go could you let me know?  And if I do is there any way that it could be at a time not over lapping [sic] my classes?

(Ex. 18 to Pl.'s Mot. for Summ. J.)  In her deposition, Wong testified that Taylor never responded to this email, and Wong assumed she was excused from the hearing.  When asked what she meant by her testimony not being "helpful" to Ross, Wong testified she did not mean her testimony would be adverse to Ross.

Taylor informed Ross and Swilling both in advance of the hearing and during the hearing that she would not consider either student's "past sexual history."  "Past sexual history" was deemed to include not only the students' consensual sexual history with other partners but also the three prior accusations of sexual violence made against Swilling.  Taylor therefore redacted all such information from the TUCP investigative report before sending it to the students and their counsel. Because everyone present knew these facts, they were "elephants in the room" during the hearing:

> Ms. Ross:  Okay.  He stated in his opening statement today that many of his witnesses believe that the sexual assault allegations . . . are completely inconsistent with Mr. Swilling's character.  However, there have been -- I am the fourth girl to report - - -
> Ms. Taylor:  Abby, you can't say that.
> Ms. Ross:  Okay.  Then has he or has he not ever had allegations against him in the past?
> Ms. Taylor:  We can't go there either, Abby.

(*Id.* at 62.)  Swilling tried to bring up information about Ross's alleged sexual history with other men on the TU campus, and Taylor did not allow that either.

14

### J.   Taylor's Decision Letter - March 31, 2014

Based on the evidence she considered, Taylor decided that Swilling did not violate the TU student code of conduct.  Taylor applied a preponderance of the evidence standard, as recommended in the DCL, meaning she found it to be more probable than not that Swilling did not sexually assault Ross.  Taylor announced her decision in a letter which summarizes the students' positions, describes the hearing, and then lists "key observations."

In its entirety, the "key observations" section provides:

Prior sexual history for both students was not considered in this hearing.

Both you and Mr. Swilling noted that your only contact had been through text messages.  You noted that you had seen Mr. Swilling at a campus party but had never spoken to Mr. Swilling prior to going to his apartment on January 27, 2014.  You stated during the hearing that Mr. Swilling answered his apartment door and directed you to his bedroom.  During the hearing, you noted that as you lay on Mr. Swilling's bed, "he rolled over, grabbed your rear end and said you have a big butt for a white girl."  You stated this made you feel uncomfortable and caused you to scoot away from him and off the bed.  However, in a text message dated January 20, 2014, Mr. Swilling made a similar statement, "I didn't know white girls had ass like that" and you responded with "Haha thanks."

Aubrey Wong provided a witness statement that the two of you decided on a secret word the night you visited Mr. Swilling's apartment.  When asked at the hearing why you didn't use the secret word you said you could not remember the word nor did you reach out to Ms. Wong.

Aubrey Wong also provided a statement to Campus Security that "Swilling was texting Ross to wear something sexy when she came over and Ross told him that she would not."   The text conversation, according to those provided by Mr. Swilling read:

> January 27, 2014
> Ross:       Are you doing anything tonight?
> Swilling:  Nah what's up?
> Ross:       I was just wondering if you wanted to hang out
> Swilling:  Yup I do where at?
> Ross:       Umm idk.  We can't have guys in the house so it's up to you
> Swilling:  I'll let you know

15

Ross:        Okayy
Swilling:    When you trying to hang?
Ross:        Whenever
Swilling:    About 9-930
Ross:        That works:)
Swilling:    wear something sexy
Ross:        Haha that makes me what to know what the plan is for tonight
Swilling:    Lol I'm jp man
Ross:        Haha okay good.  But really what do you want to do tonight?
Swilling:    It's up to you!
Ross:        Hmm well idk what there is to do
Swilling:    idk we'll see
Ross:        Okay do you think you would be able to pick me up?
Swilling:    Uhm maybe probably
Ross:        Alrighty just let me know:)
Swilling:    Wyd
Ross:        Just doin laundry
Swilling:    You ready
Ross:        Yepp
Swilling:    My teammate had my car so can you walk over?
Ross:        Yeah
Swilling:    Ok
Ross:        Where's your apt
Swilling:    Lorton Village Apt 4033
Ross:        Alrighty
Swilling:    Cool
Ross:        Did you tell Rashad I was coming over
Swilling:    No why
Ross:        What building is it?
Swilling:    1st
Ross:        Here

The statement you provided to the Office of Student Affairs on March 2, 2004, states "He then started asking me to hang out with him every day for about 4 days.  I finally gave in and agreed to hang out with him on the night of January 27, 2014.  Before I went over there, we made it clear that we were not going to hook up."  That does not appear clear in the above referenced text message.

Mr. Swilling said you made him "pinky promise" that he would not tell anyone that the two of you had sex.  He stated the "pinky promise" entailed linking "pinky fingers" and kissing your thumb.  You said that it had been Mr. Swilling who asked you to "pinky promise" that you would not tell anyone what happened the night of January 27, 2014.  Mr. Swilling inquired of your witness, Erin Anderson, if she had

ever seen you "pinky promise" and she stated you link "pinky fingers" and kiss the thumb.

(Ex. 29 to Def.'s Mot. for Summ. J.)

When questioned about these "key observations" in her deposition, Taylor admitted that she did not draft all of them. She completed an original draft, sent it to Cremin for review, and Cremin added some of the key observations quoted above. (Taylor Dep. at 162.) Taylor made the final decision, but she and Cremin functioned as a "two person review of the final outcome of the hearing." (*Id.* at 186.)

### K. Aftermath

Following issuance of the "no violation" finding, Swilling remained on the TU campus and returned the following year as a student-athlete. TU did not further investigate the 2012 Report or the 2013 Incident. Taylor admitted that she had concerns about Swilling remaining on the TU campus and "did not want to be in this position again." (*Id.* at 191.) TPD did not file criminal charges against Swilling. In March 2014, during the second semester of her sophomore year, Ross moved home and never returned to TU. On August 18, 2014, Ross filed this lawsuit.

### L. Decision to Exclude Prior Allegations Against Swilling

Because it is a crucial issue, the Court has closely examined the record regarding the decision to exclude the prior accusations against Swilling from the student conduct hearing. Taylor testified that this was the first time TU had been faced with the decision of whether to consider prior, similar allegations against a student accused of rape. (*Id.* at 66.) She testified that she did not make the decision to exclude the prior allegations against Swilling, that she advocated for their consideration, and that she was overruled by Cremin:

> Q:  Is there a point, do you think, in terms of a number of allegations of sexual misconduct against somebody where you think you might consider the additional allegations in a code of conduct hearing? . . . .
> A:  I would like to be able to use all of the information in a code of conduct hearing based on the allegations that are made by other students.  But again, upon advice of counsel I wasn't able to bring that information into the hearing process.
> Q:  So you would have been okay with having all the information considered as a part of the record?
> A: Yes.
> Q: Okay.  Did you advocate for that?
> A: Yes.
> Q: Okay.  Now, ironically, you actually were the hearing officer, so you did have all the information, you just couldn't use it as a part of your determination?
> A: I couldn't use it as a part of my determination.

(*Id.* at 121-22.)  She testified that she does not "think there is anything specifically in the policy" addressing this issue.  (*Id.* at 66.)[10]  She also testified as to whether considering these prior allegations would have impacted her decision:

> Q:  Okay.  If [Jane Doe 1's] account had been admitted and [the CSI Report] had been admitted and you were able to consider those things, could have that impacted whether Mr.  Swilling was found responsible?
> A:  I think that's . . . a huge amount of information in determining whether or not he can be held responsible.  Yes, I believe it would have made a difference.
> Q:  But you were overruled on that by Mr.  Cremin?
> A:  That's correct.

(*Id.* at 130.)  Following her deposition, Taylor filed an errata correction changing "would" to "could" in the above-quoted testimony.

Taylor is the TU official with the most training in Title IX as it relates specifically to sexual misconduct, and she is the TU official responsible for Title IX compliance as it relates to sexual

---

[10]  Other portions of Taylor's testimony indicate that she helped draft policies excluding prior acts from student conduct hearings unless there has been a finding of responsibility.  (*Id.* at 26-29.)  It is not clear to the Court whether she was discussing the General Procedures or the Sexual Violence Policy.  Regardless, construing her testimony in favor of Ross, Taylor testified that she did not believe any TU policies controlled the exclusion decision.

misconduct.  Taylor has attended numerous conferences and seminars on this topic.  In September 2013, Taylor participated in a training webinar entitled "Webinar: Sexual Misconduct and Title IX Investigations."  In the training materials accompanying this webinar, participants were advised to include in their "Final Report" whether "similar allegations have been made against" the student accused of sexual misconduct.  (*See* Ex. 27 to Pl.'s Resp. to Def's Mot. for Summ. J.)

## V.  Title IX Claims

Title IX contains the following nondiscrimination mandate:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).  Sexual harassment "is a form of discrimination on the basis of sex and is actionable under Title IX."  *Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006).  As explained in the DCL, "sexual harassment" extends to sexual violence, including "acquaintance rape" or "target rape" on college campuses.[11]

Under its statutory terms, Title IX may be enforced only through "administrative" mechanisms.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (explaining that federal agencies "establish requirements to effectuate the nondiscrimination mandate" and then enforce those requirements by terminating federal funds).  Recently, the OCR has increased administrative enforcement of Title IX as it relates to sexual violence on college campuses.  *See*

---

[11]  Some advocates have proposed a change in rhetoric from "date rape" or "acquaintance rape" to "target rape" in order to "capture the reality of the vast majority of campus rapes, and to distinguish these cases from genuine misunderstandings about consent."  *See* Diane Rosenfeld, *Uncomfortable Conversations: Confronting the Reality of Target Rape on Campus*, 128 Harv. L. Rev. F. 359, 360 (June 2015) (explaining that "target rape is not the product of misunderstandings between two equally situated students, but rather a patterned behavior that is premeditated, intentional, and often repeated").

Rosenfeld, 128 Harv. L. Rev. F. at 366 n.25 (noting that OCR was, in April of 2015, investigating over one hundred colleges' handling of sexual violence reports).

By Supreme Court decision, Title IX may also be enforced through civil damages suits; however, civil liability arises "only when the recipient of federal funds has actual notice of the alleged discrimination and responds with deliberate indifference to that discrimination." *Gebser*, 524 U.S. at 290-91 (addressing whether school was deliberately indifferent to teacher-on-student sexual harassment); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (adopting same standard for student-on-student sexual harassment). Thus, while a private right of action exists under Title IX, it requires more than negligence by school officials. *See id.* at 641.

A plaintiff seeking damages under Title IX based on a school's response to sexual harassment or sexual violence must show three elements:

> (1) . . . the [school] remains deliberately indifferent to acts of harassment of which it has actual knowledge, (2) the harassment was reported to an appropriate person . . . with the authority to take corrective action to end the discrimination, and (3) the harassment was so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school.

*Escue*, 450 F.3d at 1152 (citations omitted). Schools cannot be held vicariously liable for acts of sexual harassment or violence committed by teachers or students on campus. *See id.* Instead, schools are liable under Title IX only for their *own* misconduct, and not just any type of misconduct. *See id.* The school must be found to have acted with legal culpability known as "deliberate indifference." *See id.* "This limited rule imposes liability only on those school[s] that choose to ignore Title IX's mandate for equal educational opportunities." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999).

20

Ross claims that TU exhibited deliberate indifference to the known risks posed by Swilling prior to her assault and then exhibited deliberate indifference to her own report of rape. Both are actionable theories of Title IX liability. *See Escue,* 450 F.3d at 1153 ("[H]arassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX."); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1346 (M.D. Ga. 2007) ("[A] court can find a Title IX violation when a university exhibits deliberate indifference before an attack that makes a student more vulnerable to the attack itself, or when a university exhibits deliberate indifference after an attack that causes a student to endure additional harassment."). The Court will address each theory separately.

### A.     Prior Accusations

In order to succeed on a "prior accusations" Title IX theory, a plaintiff must show that a school had "'actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.'" *Escue*, 450 F.3d at 1154 (quoting *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1033 (D. Nev. 2004)). Ross must therefore show that an appropriate person at TU had actual knowledge of a substantial risk that Swilling would commit sexual assault and then acted with deliberate indifference to that risk.

In January 2014, when Ross's alleged rape occurred, no individual or entity had knowledge of the CSI Report or the 2013 Incident. TUCP did have knowledge of the 2012 Report regarding Swilling's assault of Jane Doe 1, and Ross argues this knowledge is sufficient to reach a jury. TU argues that Ross's "prior accusations" theory fails because: (1) the 2012 Report was not made to an appropriate person; (2) the 2012 Report was not sufficient to provide notice that Swilling posed a

substantial risk; and (3) its conduct in response to the 2012 Report did not amount to deliberate indifference.

### 1.      Appropriate Person

In *Gebser*, the Supreme Court held that damages would not lie unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination." *Gebser*, 524 U.S. at 290; *Escue*, 450 F.3d at 1152 (an "appropriate person" is one with "the authority to take corrective action to end the discrimination"). This requirement aims to ensure that schools are only held liable for official decisions, rather than for their employees' independent actions. *See J.M. v. Hilldale Indep. Sch. Dist.*, 397 F. App'x 445, 450 (10th Cir. 2010) (citing *Gebser*). The Tenth Circuit has declined to "simply name job titles that would or would not adequately satisfy this requirement" and has instead characterized this question as a fact-dependent inquiry. *Murrell*, 186 F.3d at 1247.

TU argues that the 2012 Report was made only to TUCP officers, who failed to pass along the information to Taylor or other TU officials. TU contends that TUCP is not an "appropriate person" because it lacked the authority to address the harassment, *i.e.*, sexual violence. TU relies upon cases holding that the individuals with knowledge of the harassment were not the type of school employees who could "end" the harassment. *See, e.g., C.S. v. Couch*, 843 F. Supp. 2d 894, 913 (N.D. Ind. 2011) (holding that fifth grade teachers and football coaches were not appropriate persons to end harassment and that their knowledge of racially hostile comments was insufficient to hold school district liable).

A jury could conclude that TUCP Officers Downe and Timmons, high-ranking TUCP officers who were aware of the 2012 Report, are "appropriate persons" with authority to institute

corrective measures aimed at ending this particular form of Title IX discrimination -- namely, sexual violence on a college campus.   First, the Sexual Violence Policy, which references Title IX, designates TUCP as a proper recipient of a sexual violence report.   Regardless of these officers' authority to make any final decision regarding Swilling's responsibility, this designation vests TUCP with authority to "address the alleged discrimination" by instituting TU's "corrective action" process.   The District Court of Minnesota addressed a similar argument made by a school district that teachers lacked authority to take corrective action to prevent harassment:

> Indeed, the School District's sexual harassment policy imposes upon teachers a duty to convey reports of sexual harassment to the school principals. *It is therefore clear that teachers had the authority to take at least this minimal corrective measure which, if effectively carried out, would impart knowledge of the harassment to higher School District officials with even greater authority to act.*

*Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1099 (D. Minn. 2000) (emphasis added); *Doe v. Defendant A*, No.  12-CIV-392, 2012 WL 6694070, at *4 (N.D. Okla. Dec.  21, 2012) (reasoning that school principal designated by school policy to receive complaints was an "appropriate person" under Title IX).

Second, Taylor's testimony supports a finding that these TUCP officers are "appropriate persons."   She testified that any TU employee who receives a report of sexual misconduct "must provide that information *either* to the Office of Campus Security *or* the Office of Student Affairs" to ensure that all reports are included in the "Clery Statistics." (Taylor Dep. 50 (emphasis added).)[12] Timmons and Taylor regularly communicate with each other regarding any reports of sexual violence on TU's campus, and they work together to address sexual violence reports.   Therefore, the

---

[12]  Taylor was referring to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act"), which requires colleges to make certain reports to the federal government.

2012 Report was not made to a low-level university employee, to an unrelated off-campus entity, or even to a professor or counselor.  The report was made to TU's version of law enforcement, which works directly with Taylor's office to investigate and combat campus violence and properly report instances of campus violence to the federal government.  TU has created a system whereby TUCP plays an integral role in receiving reporting and instituting corrective Title IX processes as they relate to sexual violence, even if TUCP does not make the final disciplinary decisions against a student.

Third, TU's Sexual Violence Policy and other surrounding facts could be viewed as creating an equitable expectation in students (and their parents) that a report to TUCP triggers any and all of TU's "corrective processes."  Adopting TU's argument would allow it to designate TUCP as an entity to receive sexual violence complaints in its own Title IX policies, fail to ensure that such entity delivers reports to the school's Title IX coordinators, and effectively shield itself from Title IX civil liability.  The Court does not read *Gebser* to require this result.  Therefore, a jury could find the 2012 Report to TUCP was made to an "appropriate person."[13]

### 2.    Knowledge of Substantial Risk

Notice of risk requires "more than a simple report of inappropriate conduct," but it also "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse."  *Escue*, 450 F.3d at 1153 (internal quotations omitted).  At some point, for example, a school official "knows that a school employee is a substantial risk to sexually abuse children."  *Id.* (internal quotations omitted).  In *Escue*, the Tenth Circuit agreed with the district

---

[13]  The Court's "appropriate person" analysis is guided by *Gebser* and not the OCR publication cited by Ross.  As argued by TU, this publication defers to *Gebser* for purposes of civil liability.  (*See* Ex. 1 to Def.'s Reply in Support of Summ. J., at n.23.)

court that prior instances of alleged harassment by that particular professor were "too dissimilar, too infrequent, and/or too distant in time" to provide the school with actual knowledge of sexual harassment in its educational programs. *Id.* at 1153-54 (recent reports that professor had consensually dated two non-traditional students were not similar in type, and other reports that he had sexually harassed students were made a decade before the instant harassment) (holding that college "simply did not have the requisite knowledge based on prior complaints to believe that [the professor] presented a substantial risk of abuse or harassment to students").

Applying *Escue*'s reasoning to student-on-student sexual violence, the question is whether the 2012 Report provided notice that Swilling posed a "substantial risk" of committing a sexually violent act. This requires analysis of what TUCP officers knew about Swilling based on the 2012 Report.

For summary judgment purposes, the Court accepts Jane Doe 1's account of what occurred in 2012, as told to TUCP and TPD during the 2014 investigation. The 2012 Report was initiated with the phone call from the football players. TUCP started looking for Jane Doe 1. When they could not find her, they called her father and told him they were looking for her because she had parking tickets. She and her father knew this was a pretense for getting her to come to the TUCP office because she did not have a car. After being called by her father, Jane Doe 1 went to the TUCP office.

Once in the TUCP office, two male officers questioned Jane Doe 1 about her reported rape. She kept her answers very brief. She told them Swilling had "taken advantage of her" the previous night in her apartment, but she did not use the word rape. She wrote a brief witness statement that did not contain any facts or details. She said she did not want to accuse Swilling of anything and

25

did not want to think about it.  She did not wish to proceed because she was scared, she did not want everyone to know her business, she knew Swilling's father had been in the NFL, and she did not think people would believe her.  TUCP offered to call TPD and she declined.  After learning about Ross's report in 2014, Jane Doe 1 expressed remorse for not proceeding against Swilling.

A reasonable jury could not conclude that the 2012 Report, as described by Jane Doe 1, put TU on notice that Swilling posed a "substantial risk" of sexual violence.  Jane Doe 1's report was not too dissimilar or too distant in time from Ross's report; however, it was too vague.  Jane Doe 1 did not willingly make any report.  She went to the TUCP office only after TUCP called her father and essentially forced her to come discuss the event.   Even under Jane Doe 1's version of events, she did not use the words "rape" or "assault."  She did not provide facts or details and was unwilling to accuse Swilling of any specific misconduct.  While one report of sexual assault could in some instances be sufficient to put a school on notice that a student poses a substantial risk, this was not such a report.  The Court concludes as a matter of law that the 2012 report -- which involved a victim who was unwilling to proceed and who stated only that Swilling took "advantage of" her -- was not sufficient to place TU on actual notice hat Swilling posed a "substantial risk" of sexually assaulting other TU students.

### 3.    Deliberate Indifference

Even assuming Ross could satisfy the "knowledge of risk" element, she still could not satisfy the deliberate indifference element.  Deliberate indifference is a high standard, and schools can avoid liability so long as their response to the reported peer-on-peer harassment was "not clearly unreasonable" in light of the circumstances known.  *Davis*, 526 U.S. at 648.  The Supreme Court did not intend this standard to be the equivalent of a "reasonableness" standard that always presents

26

a jury question.  *Id.* at 649.  Instead, courts may, on a motion to dismiss, for summary judgment, or for a directed verdict, identify a school's response as "not clearly unreasonable" as a matter of law. *Id.*  Courts should not "second guess decisions" made by school officials or permit students to demand certain remedies.  *Id.* at 648.  The type of educational setting must be considered in determining the reasonableness of a response.  *Id.* at 649 ("A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy.").

Assuming for summary judgment purposes that Jane Doe 1 reported sexual violence, TUCP officers should have, at a minimum, generated an incident report and conducted further investigation.  The DCL encourages colleges to investigate reports of sexual violence regardless of the victim's willingness to proceed; the Sexual Violence Policy contemplates investigation even when a victim is unwilling to proceed; Timmons indicated that a report should have been filed; and TU had generated reports in prior similar cases involving a victim who did not wish to proceed.  (*See* Dep. of David Friend ("Friend"), Ex. 15 to Pl.'s Resp. to Mot. for Summ. J., at 12-41 (former TUCP officer explaining that "[w]hether or not the victim was interested in making a report or not, it was still a reportable offense" and that "the university had a duty to investigate and determine if that offense had been committed . . . with or without the victim cooperation").)[14]

However, failing to follow best practices or past practices is not equivalent to deliberate indifference or clearly unreasonable conduct under Title IX.  TUCP promptly investigated the phone call by contacting the victim and obtaining her statement.  Assuming Jane Doe 1 reported an assault, there is still no dispute that Jane Doe 1 did not want to file criminal charges or initiate a student

---

[14]  The Court finds Friend's testimony relevant and overrules TU's motion in limine (Doc. 204-8) regarding Friend for purposes of ruling on summary judgment.

conduct complaint against Swilling.  Campus security officers and school administrators walk a fine line when they investigate a report of sexual assault by a victim who is unwilling to proceed or make any specific accusations.  As stated by Jane Doe 1 in 2014, she only had one semester left of school and did not want any disruption of her life prior to her graduation.  Interviewing Jane Doe 1's friend, Swilling, and other members of the small TU campus or ultimately taking action against Swilling would undoubtedly have caused this type of unwanted disruption.  While perhaps not in accordance with Title IX best practices or the OCR's guidance in the DCL, TU's response to the 2012 Report could not be deemed "deliberately indifferent" in light of the nature of such report.

In addition to a theory of deliberate indifference premised on *mishandling/failing to investigate* the 2012 Report, Ross also appears to assert that TUCP acted with *intentional bias* in favor of Swilling in its response.  Circumstantial evidence presented by Ross includes: (1) TUCP officers knew Swilling was an athlete; (2) Underwood told TPD that he was surprised Downe did not require him to file a report; and (3) Friend indicated that TUCP handled a prior, similar report by a reluctant victim differently than it handled Jane Doe 1's report.

However, this circumstantial evidence is disjointed and could not direct a reasonable jury to any one theory of intentionally biased conduct by TUCP in favor of Swilling.  Downe made the decision not to file a report or continue the investigation.  There is simply not enough evidence to raise an inference that Downe was trying to protect Swilling because he was an athlete, such as if Downe spoke with basketball coaches prior to instructing Underwood not to file a report.  Nor is there evidence raising an inference that Downe was concerned with keeping down the number of Clery Act reports at the expense of student safety.  Inconsistencies between Downe's treatment of Jane Doe 1's report and treatment of prior similar reports, while concerning to the Court, also are

not enough to create a jury question as to whether Downe or any other TUCP officer acted with some type of intentional bias in favor of Swilling.  Based on the evidence presented in support of this theory, a reasonable jury could not conclude Downe was intentionally protecting Swilling or acting with some other improper purpose when he made the decision not to further investigate the 2012 Report.[15]

## B.  Ross's Report

This theory of Title IX liability hinges on TU's conduct following Ross's report of rape. Because Ross made her report directly to Taylor, TU does not dispute the "appropriate person" element.  Instead, TU challenges only whether Ross can show "deliberate indifference."

In response to Ross's report of rape, TU conducted an investigation, held a student conduct hearing, and issued written findings setting forth reasons for its decision in favor of Swilling. Instead of being "indifferent" to Ross's complaint, TU acted upon it.  Further, Swilling was suspended from the basketball team while the investigation was pending.  This is certainly not a situation where TU waited until the end of Swilling's athletic season to begin an investigation or otherwise delayed its efforts.  On its face, TU's conduct appears more than sufficient to avoid civil liability for peer-on-peer sexual violence under Title IX.

---

[15]   The email attached as Exhibit 2 to TU's reply brief, wherein a federal agency states that TU was "correct in not counting [the 2012 Report] among your 2012 crimes" (*see* Ex. 2 to Def.'s Reply in Support of Summ. J.), played no role in the Court's ruling.  When emailing the federal agency, TUCP framed the question based on its version of the facts.  (*See id.* ("When we interviewed the alleged victim at that time, she denied that a rape ever occurred . . . .").)  It is therefore not helpful to TU at the summary judgment stage.

However, Ross urges the Court to permit a jury to probe deeper and conclude that, although TU did not ignore Ross's report, it handled her report in a deliberately indifferent manner. Ross contends that her evidence

> support[s] the reasonable inference that TU pre-decided the outcome and conducted a sham hearing. . . . TU knowingly failed to investigate prior allegations of sexual assault that were relevant to Plaintiff's hearing, and [] TU refused to consider those allegations despite Taylor's training and expert belief to the contrary. . . . TU's refusal to consider the prior allegations had a material impact on the outcome of the hearing, and there is evidence that Taylor's failure or refusal to accommodate a critical witness allowed TU to craft a decision letter with "key observations" that have no foundation in fact.

(Pl.'s Resp. to Mot. for Summ. J. 24.)

Ross has not cited a Title IX case discussing a "sham process" theory of deliberate indifference to a report of sexual violence. However, the Court finds no reason to disallow such theory so long as there is sufficient evidence to support it. Intentionally biased student conduct proceedings, or clearly unreasonable methods of handling student reports of sexual violence, seem to fit within the parameters of Title IX "deliberate indifference" liability as outlined in *Gebser* and *Davis*.[16]

---

[16] The Court located cases discussing an "erroneous outcome" theory of Title IX liability asserted by expelled male students claiming the college processes were biased against them. *See, e.g., Peter v. Vassar Coll.*, 97 F. Supp. 2d 448, 469-70 (S.D.N.Y. 2015) (male student expelled after being found responsible for sexual assault alleged, among other things, that process was flawed and began with a "presumption of male guilt"); *Doe v. Brown Univ.*, No. CV 15-144 S, 2016 WL 715794, at *1 (D.R.I. Feb. 22, 2016) ("This case is one of a number of recent actions in the federal district courts in which a male student has sued a university that found him responsible for committing sexual assault after an allegedly flawed and deficient disciplinary proceeding."). Here, Ross did not argue "erroneous outcome," and she was not expelled. Nonetheless, her allegations regarding a flawed process bear some similarity to males alleging they were wrongly expelled for rape.

30

In this case, Ross has not presented sufficient evidence to reach a jury on the issue of deliberate indifference for four reasons: (1) TU conducted at least some investigation of the prior accusations; (2) there is insufficient evidence of a "pre-decided" outcome; (3) TU's decision to exclude prior accusations from the hearing, while perhaps misguided, does not evidence deliberate indifference; and (4) other alleged problems in the process are too minor to amount to deliberate indifference.

### 1. Investigation

Although deficient at first, upon Taylor's insistence, TUCP eventually conducted an adequate investigation. TUCP obtained over fifteen witness statements from TU students regarding Ross's allegation and the 2013 Incident. TUCP also investigated the 2012 Report by contacting and obtaining statements from Jane Doe 1 and her friend, who were no longer on campus. TUCP prepared a report, which was provided to Taylor. There was no deliberate indifference by TUCP in its overall investigation of Ross's report, and, contrary to Ross's assertions, the investigation included some inquiry into the prior accusations against Swilling.

### 2. Pre-Decided Outcome

Ross has certainly not presented evidence that Taylor, the sole-decisionmaker, "pre-decided" the outcome in favor of Swilling. Ross has not tried to portray Taylor as a biased or unfair decisionmaker; nor could she. Taylor's deposition reveals that she was concerned about the fairness and integrity of the Title IX proceeding and that she takes her Title IX responsibilities seriously.

Ross's theory seems to be that some other TU official pre-decided the outcome and then intentionally manipulated the process conducted by Taylor in favor of Swilling. But Ross lacks evidence of this type of manipulation and cannot point to any TU official who was "pulling the

strings." Taylor's testimony reveals that she presided over the hearing herself. Taylor testified that she alone made the decision against Ross, and Taylor did not waiver on this point. Although Cremin was involved in reviewing her draft and adding observations, Taylor testified that her original draft also found in favor of Swilling. Further, there is no direct evidence or evidence creating an inference that Cremin was taking orders from TU's basketball coach, athletic director, president, or some other official who had an agenda of "clearing" Swilling.

The phone call from Brewster to Bauman is offered as support for Ross's "pre-decided outcome" theory. In such call, Brewster stated that an "Assistant Dean," presumably Putnam, told him that Swilling was "cleared as far as the university is concerned." However, there is no further summary judgment evidence linking Putnam to Brewster, explaining this call, or indicating that Putnam was somehow trying to protect Swilling. In an email forwarding the voicemail to a TU vice president, TU's Athletic Director Derrick Gragg ("Gragg") described Brewster's voicemail as "truly baffling." (Ex. 30 to Pl.'s Resp. to Mot. for Summ. J.) Rather than confirm that some TU official had "pre-decided" the outcome, this indicates Gragg had no idea what Brewster was talking about. Ross has failed to show this call was anything other than a self-serving attempt to allow Swilling to rejoin the basketball team (which TU never permitted). Most importantly, any inference a jury could glean from this phone call is squelched by Taylor's testimony that she was the sole decisionmaker. Putnam played no role in Taylor's "no violation" decision. No reasonable jury could conclude that Taylor "pre-decided" the outcome of the hearing or was coerced by some higher-level TU official to decide in favor of Swilling.

### 3.    Exclusion of Prior Accusations Against Swilling

Ross cites TU's exclusion of prior accusations against Swilling from the student conduct hearing, notwithstanding Taylor's objection, as evidence of "clear unreasonableness" or "deliberate indifference."   Taylor was TU's expert on Title IX as it relates to sexual violence, and TU nonetheless ignored Taylor's opinion that it should consider the prior accusations.  Taylor admitted the information would (or at least could) have influenced her decision.

Although this is Ross's strongest theory of deliberate indifference, it is still not enough to create a jury question.  Taylor was relying upon advice of counsel in failing to consider the prior accusations.  Counsel's advice was at least arguably consistent with (1) the Sexual Violence Policy, which provides that "the past sexual history of the complainant and alleged perpetrator will be deemed irrelevant to the proceeding process except as that history may be related directly to the incident being heard," and (2) the General Procedures, which provide "[i]nformation regarding a prior complaint against the accused student that did not result in a finding of responsibility shall not be admissible at the proceedings."  Taylor disagreed with Cremin but felt compelled to follow his advice on this particular issue.  Following advice of counsel that at least arguably comports with school policy cannot be deemed deliberate indifference or clearly unreasonable conduct by TU.  *See Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir.1998) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ."); *Estate of Thomason ex rel. Perez v. Cty. of Klamath*, No. CIV.01-3004-CO, 2004 WL 1598802, at *17 (D. Or. July 16, 2004) (holding, in context of § 1983, that sheriff's failure to implement a judge's order did not constitute deliberate indifference where he relied upon advice of counsel).

33

To be clear, a jury could conclude TU should have permitted Taylor to consider the evidence. Arguably, the Sexual Violence Policy's exclusion of "past sexual history" refers to past instances of *consensual* sex by the alleged victim or perpetrator, not past accusations of *non-consensual* sexual assault or violence. Further, past accusations of sexual assault made against the accused likely fit the Sexual Violence Policy's exception for "history that relates directly" to the incident being heard. TU's interpretation of the Sexual Violence Policy in this case could lead to a "target rapist" on a college campus being repeatedly accused but repeatedly cleared despite a pattern of the same conduct. However, the civil liability standard outlined by the Supreme Court does not require universities to behave perfectly or even very well. It requires universities to respond to reports of peer-on-peer sexual violence in a manner that is not clearly unreasonable or deliberately indifferent. A possible misapplication of a school's evidentiary policy, particularly where the school sought and received advice of outside counsel, is not "clearly unreasonable" as a matter of law.

### 4.        Other Problems

Other alleged problems with the hearing process include failing to force Wong to attend the hearing and issuing a decision letter with no "foundation in fact." These are the types of decisions by university officials that Title IX simply cannot reach under a "deliberate indifference" standard. Taylor did not give her reasons for failing to require Wong to attend the hearing, but they could be numerous. TU is not required to explain or justify every detail of its process in order to avoid civil liability under Title IX. Similarly, with respect to the decision letter, a jury does not sit to revisit a university's factual findings and certainly does not sit as an appellate court looking for possible errors. The Court happens to agree with Ross that portions of the decision reflect strained reasoning, particularly the conclusion drawn from the students' text exchange. However, Taylor's decision

hinges primarily on credibility assessments, which are beyond the scope of judicial review under Title IX.

The inquiry is not whether TU could have done better; it is whether TU acted with deliberate indifference to its Title IX obligations when Ross reported rape.  TU investigated, held a hearing, and issued written findings, all while Swilling was suspended from the basketball team. Although intentionally manipulated processes could create Title IX liability in some case, Ross does not have sufficient evidence of any purposeful manipulation of the hearing in favor of Swilling or other "clearly unreasonable" conduct by TU.

## VI.    Negligence Claims[17]

The three elements of a negligence claim are: "(1) a duty owed by the defendant to protect plaintiff from injury[;](2) failure to fulfill that duty[;] and (3) injuries to plaintiff proximately caused by defendant's failure to meet the duty." *Fargo v. Hays-Kuehn*, 352 P.3d 1223, 1227 (Okla. 2015). TU challenges the first and third elements -- duty and proximate cause.  Because the Court concludes that no duty exists as a matter of law, the Court does not reach the issue of proximate cause.

"Duty is the threshold question in any negligence action," and the "existence of a duty presents a question of law."  *Bray v. St. John Health Sys., Inc.*, 187 P.3d 721, 723 (Okla. 2008). "[T]he existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking."  *Wofford v. Eastern State Hosp.*, 795 P.2d 516, 519 (Okla. 1990).  "Oklahoma follows the common law principle of negligence that generally no duty is owed

---

[17]   The parties did not separately address Counts 4 and 5 in their briefs but instead treated them as one claim.  These counts present similar legal issues and are addressed together.

to aid or protect another" or to "anticipate and prevent the intentional or criminal acts of a third party." *J.S. v. Harris*, 227 P.3d 1089, 1092 (Okla. Civ. App. 2009).  However, a special relationship or special circumstances may give rise to such a duty.  *Id.*

The university-student relationship is not a "special relationship" that itself creates a duty to protect students from a third party.  *Vega v. Sacred Heart Univ., Inc.*, 836 F. Supp. 2d 58, 61-62 (D. Conn. 2011); *Nero v. Kan. State Univ.*, 861 P.2d 768, 778 (Kan. 1993) ("[T]he university-student relationship does not in and of itself impose a duty upon universities to protect students from the actions of fellow students or third parties."); Aliza Milner, *Causes of Action Against College or University for Injury Inflicted on Student by Third Party*, 31 Causes of Action 2d 675, § 7 (Supp. 2015) ("A majority of appellate courts have rejected the university-student relationship alone as a basis for liability."); Eric A. Hoffman, *Taking a Bullet: Are Colleges Exposing Themselves to Tort Liability by Attempting to Save Their Students*, 29 Ga. St. L. Rev. 539, 566 (Winter 2013) ("Litigants often unsuccessfully argue that the university-student relationship is special and should give rise to liability when a college did not prevent an injury.").

However, a duty to protect may arise based on other facts.  Injured college students have argued, with varying degrees of success, the following theories of duty: (1) "custodian-charge" duty similar to that outlined in Restatement (Second) of Torts §§ 315(a) and 319, where a college's notice of risks posed by the alleged wrongdoer gives rise to a duty to the injured plaintiff;[18] (2) a "business-invitee" duty similar to that outlined in § 344, where the college's status as business owner creates

---

[18]  As explained below, Ross relies exclusively upon this theory of duty.

a duty to warn its invitee students of foreseeable harm;[19] (3) a "landlord-tenant" duty similar to that outlined in § 358, where a lessor knows or should know of an unreasonably unsafe risk or condition risk of harm;[20] and (4) a "protector-protectorate" duty similar to that outlined in § 323, where one undertakes to render services for another's protection and the failure to exercise reasonable care increases the injured party's risk of harm, or the harm is suffered because of the victim's reliance on the undertaking.[21] *See Milner*, 31 Causes of Action 2d 675, §§ 8-11.

In this case, Ross raised only one theory of duty -- a duty based upon TU's "special relationship" with Swilling as a TU student who it (1) controlled, and (2) knew or should have known had a tendency to commit sexual assault.  Specifically, TU argues:

> [I]t cannot be reasonably disputed that TU had control over Swilling's status as a student, which implicates his ability to maintain student housing where the rape occurred, and even his ability to walk on its campus.  As a private university, TU can expel students who commit acts of sexual violence . . . .  Likewise, the [reports of the 2012 Incident] support[] the reasonable inference that TU either knew or should have known that Swilling harbored violent propensities towards women that included

---

[19] *See, e.g.*, *Stanton v. Univ. of Maine Sys.*, 773 A.2d 1045, 1049 (Me. 2001) ("That a sexual assault could occur in a dormitory on a college campus is foreseeable and that fact is evidenced in part by the security measures the University had implemented."); *see also Doe v. Emerson Coll.*, No. CV 14-14752-FDS, 2015 WL 9455576, at *7 (D. Mass. Dec. 23, 2015) (holding that college owed "a special duty to Doe as a student housed in a facility on its campus" but that such duty did not "extend so far" as an off-campus party).

[20] *See, e.g., Williams v. Utica Coll.*, 453 F.3d 112, 116-18 (2d Cir. 2006) (college not entitled to summary judgment on question of duty where student was assaulted by unknown attacker who came in through door left slightly ajar, and consulting security company had told college to monitor that area more closely); *Nero*, 861 P.2d at 778-79 (finding college had duty as a landlord to female resident of a co-ed dorm who was raped by male resident of co-ed dorm when college knew of prior rape accusation and opted to "rent space to him" anyway in proximity to females).

[21] *See, e.g.*, *Vega*, 836 F. Supp. 2d at 62 (plaintiff adequately alleged college undertook to protect her from foreseeable attacks by third parties "by way of its affirmative avowals of its anti-harassment and anti-hazing policies, and the steps the university took to enforce those policies").

> sexual assault.  This would be abundantly clear had TU interviewed [Jane Doe 1's friend].

(Pl.'s Resp. to Def.'s Mot. for Summ. J. 28.)

The Oklahoma Supreme Court first recognized this type of duty -- namely, one arising from the relationship between the defendant and the third party inflicting harm -- in the context of a psychiatrist-patient relationship:

> Under this exception, a duty arises if *(1) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct* . . . . Under the Restatement approach the psychotherapist/patient relationship has been found to be a sufficient basis for imposing a duty on the therapist and the hospital for the benefit of persons injured by a released patient. *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb.1980); *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976).

*Wofford*, 795 P.2d at 520; *J.S.*, 227 P.3d at 1093 (discussing possible theories of duty where party other than defendant inflicts harm).  In *Wofford*, the Oklahoma Supreme Court held that this type of duty arises "when in accordance with the standards of his profession the therapist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm" and that the duty "extends to persons as are foreseeably endangered by the patient's release." *Id.*  The court held that no duty arose in that case because there "was no evidence at the time of his release" that the patient posed an "unreasonable risk of danger" or that the hospital "knew or should have known" of the patient's "violent propensities at the time of his release."  *Id.* at 521.

Based on *Wofford*, Oklahoma law requires analysis of three factors in determining whether TU owed this type of duty: (1) TU's control over Swilling; (2) TU's actual or constructive knowledge of the risks he posed; and (3) the foreseeability of Ross's alleged rape.

38

A.      TU's Control Over Swilling

In *Wofford* and the Restatement example, the defendant had a substantial degree of control over that party's freedom.  *See Wofford,* 795 P.2d at 520 (mental institution); Restatement (Second) of Torts § 319 (providing example of insane asylum's duty to injured parties when it releases a known "homicidal maniac").  Due to the lesser degree of control colleges exercise over students' general freedom of movement, courts are hesitant to extend this type of duty to the college setting. *See Nero*, 861 P.2d at 778-79 (college received report that male student raped female student who resided with him in a co-ed dorm, moved him to an all-male dorm,  placed him in a co-ed dorm again upon his re-enrollment, where he raped a second female student) (rejecting the plaintiff's arguments that a duty arose based on the college's special relationship with the known dangerous student because college had not taken necessary "charge" or "control" of student's actions).  The Court finds that TU exercises some disciplinary control over Swilling and its other students but certainly less than a mental institution or other "custodian" of an individual.  Therefore, the control factor weighs against a finding of duty.[22]

B.  Knowledge of Risk

The Court has already held that the information TU/TUCP[23] *actually* had about Swilling was not sufficient to provide notice that Swilling posed a "substantial risk" to other students.  *See* Part V.A.2.  For the same reasons, the Court holds that this actual knowledge did not provide notice that

---

[22] "Control" is also relevant to the Title IX analysis.  *See Davis*, 526 U.S. at 647-48 (explaining that Title IX liability only applies when a school "exercises substantial control over both the harasser and the context in which the known harassment occurs").  TU did not argue a lack of "control" over Swilling for purposes of summary judgment on the Title IX claim.

[23] For the same reasons explained in Part V.A.1, the Court finds that TUCP's knowledge may be considered for purposes of imposing a duty upon TU.

Swilling posed an "unreasonable risk" of danger such that TU had a duty to protect students from him. *See Wofford*, 795 P.2d at 521 (discussing whether patient posed "unreasonable risk of danger"); *Escue*, 450 F.3d at 1156 (explaining that "knowledge of substantial risk" prong of Title IX analysis "largely overlaps" with negligence analysis premised upon failure to supervise third party).

Unlike Title IX's "actual knowledge" standard, the question of duty in a negligence action can also encompass inquiry notice -- what TU should have known about Swilling in the exercise of reasonable diligence. *See Wofford*, 795 P.2d at 521 (discussing what hospital knew or should have known at time of patient's release). The issue of inquiry notice requires further analysis than that provided in Part V.A.2., which relates only to actual knowledge.

There are two instances raising the question of whether TU should have "done more" to learn information about Swilling. The first is during the recruiting process. Manning and Bauman asked questions to elicit information about Swilling's off-court behavior, but Gosar chose not to disclose the CSI Report. There is no evidence that TU basketball coaches did not ask certain questions because they were afraid of the answer or any other "wink-wink" type of exchange between the two programs. Instead, TU coaches followed their typical recruiting procedures. The Court finds that, despite reasonable diligence, TU did not discover the CSI Report and did not have reason to suspect Swilling would commit sexual assault on the TU campus. *Cf. Estate of Butler ex rel. Butler v. Maharishi Univ. of Mgmt.*, 589 F. Supp. 2d 1150, 1169-70 (S.D. Iowa 2008) (allowing "negligent screening" claim to proceed to jury where student who stabbed and killed another student on college campus had disclosed to college during admissions process that he had been arrested multiple times

and, construing facts in favor of the plaintiff, college could have easily discovered that prior arrests were for violent assaults related to the student's schizophrenia).

The other instance where TU, by and through TUCP, had an opportunity to discover more about Swilling was following the 2012 Report. This is the thrust of Ross's argument in favor of a duty. Ross argues that, if TUCP simply would have interviewed Jane Doe 1's friend, it would have discovered that Swilling posed a substantial risk of danger. As explained above in its Title IX analysis, TUCP did not follow "best practices" under Title IX in handling the 2012 Report, assuming that Jane Doe 1 described a sexual assault. (*See* Part V.A.2.) However, the legal question is whether TU "reasonably should have known" about Swilling's alleged violent tendencies back in 2012.

The policy implications of imposing an inquiry-based duty in this case must be considered. Jane Doe 1 admits she did not want to initiate a criminal investigation and had no intention of doing so. She also admits she did not want to accuse Swilling of student misconduct. It would place too great a burden upon TU/TUCP to investigate, discover evidence, and then exercise due care to prevent a future crime by Swilling without the cooperation of the victim or any investigation by an outside law enforcement agency. Further, it is speculative that, had TU investigated further in 2012, any alleged dangerous tendencies of Swilling would have come to light. This may be a different case if TU could have, with minimal investigative efforts, uncovered a criminal rape conviction or even arrest. But there was no "smoking gun" waiting to be discovered by TUCP in 2012. Investigation into the 2012 Report also would have turned on credibility assessments and may or may not have resulted in a finding of responsibility. The Court cannot conclude that TU should have known, had it exercised reasonable diligence following the 2012 Report, that Swilling posed a danger to all students on campus.

41

C.      Foreseeability of Harm

Foreseeability, as it relates to the existence of a legal duty, analyzes what "zone of risk" is created by the allegedly negligent conduct and serves as a "minimum legal threshold for opening the courthouse doors." *Delbrel v. Doenges Bros. Ford, Inc.*, 913 P.2d 1318, 1322 (Okla. 1996). Foreseeability, as it relates to proximate cause, "is a much more specific factual requirement that must be proved to win the case once the courthouse doors are open." *Id.* Thus, the question at this stage is not whether TU's action or inaction in 2012 was the proximate cause of Ross's alleged rape. The hurdle is lower and requires only that the harm suffered was within a foreseeable zone of risk.

For the same reasons explained above in the Court's discussion of knowledge, TU lacked sufficient information regarding Swilling to give rise to a foreseeable "zone of risk" that extended to Ross's rape in Swilling's on-campus apartment in 2014.  The 2012 Report did not result in any findings regarding Swilling that created a "zone of risk" consisting of the entire campus for the duration of Swilling's status as a TU student.  For the same reasons explained above, the 2012 Report did not place TU on sufficient inquiry notice that such a zone of risk existed.  There was no discoverable evidence that Swilling had been charged with or actually committed similar crimes, *see generally Murrell v. Mount St. Clare Coll.*, No. 3:00-CV-90204, 2001 WL 1678766, at *4 (N.D. Iowa Sept. 10, 2001) ("A college, or any other kind of landlord, is incapable of foreseeing an acquaintance rape that takes place in the private quarters of a student or tenant, unless a specific student has a past history of such *crimes*.") (emphasis added), and it is overly speculative that further investigation of the 2012 Report would have led to actual knowledge of dangerous tendencies or a finding of responsibility in Jane Doe 1's case.

The Court's duty analysis begs the question: is there any number of *allegations* of sexual assault against one student that gives rise to a college's duty to exercise reasonable care in preventing sexual assault by that student on campus?  In this case, the Court holds that one report is not enough, at least where the victim expresses a desire not to proceed and the accused has no prior arrests or convictions for sexual assault.

## VII.   IIED

To succeed on an IIED claim, a plaintiff must show: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff to suffer emotional distress; and (4) the plaintiff's emotional distress was severe.  *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 (10th Cir. 1991) (applying Oklahoma law).  TU challenges the first and second elements.

For the same reasons explained in Part V.B, a jury could not conclude that TU acted intentionally or recklessly in response to Ross's report.  Nor could a jury find that its conduct was extreme and outrageous.   TU suspended Swilling from the basketball team, conducted an investigation, and held a student conduct hearing.  Accordingly, Ross cannot satisfy the first or second element of this claim.

## VIII.   Conclusion

Defendant's Motion for Summary Judgment on all remaining claims (Doc. 95) is GRANTED.  The Court will enter a separate judgment.

**SO ORDERED** this 15th day of April, 2016.

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**